UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**MICAH R. WALKER M.D., PLLC**
**d/b/a Women's Wellness of Mississippi**
**and NewCare MD, LLC** **Plaintiffs**

**v.** **Civil Action No.: 3:26-cv-00982-HTW-LGI**

**Defendants**

**MORGAN CHARLEIGH PITTS, KIMBERLY AMANDA FLEMING DAVIS, MOKI, LLC d/b/a MOKI Wellness & Aesthetics, M CHARLEIGH CONSULTING, LLC, and UNKNOWN ADDITIONAL ENTITIES OR PERSONS A through Z**

# PLAINTIFFS' MEMORANDUM BRIEF IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

******URGENT AND NECESSITOUS MOTION******

Plaintiffs Micah R. Walker M.D., PLLC d/b/a Women's Wellness of Mississippi ("MRW MD") and NewCare MD, LLC ("NewCare") (collectively "the Practices") submit the following brief in support of their Motion for a Temporary Restraining Order and Preliminary Injunction, as follows:

## Introduction

This case presents the archetypal circumstance in which preliminary injunctive relief is necessary: two departing nurse practitioners, Morgan Charleigh Pitts ("Pitts") and Kimberly Amanda Fleming Davis ("Davis") took the Practices' confidential information to a competing venture, MOKI, LLC ("MOKI") and then locked out the Practices from access to ClinIQ, a cloud based clinic software platform developed within the Practices (that the Practices claim ownership of ) that houses protected health information ("PHI") from the Practices' patients— locking the

Practices out of what appears to be more than approximately 1,800 patient profiles on infrastructure the Practices no longer control as a result of the lockout. The lockout has persisted since approximately September 21, 2026. By mid-October, Defendants, through counsel, had admitted they are withholding the Practices' PHI. Yet they will not agree to return it.

Also, within days of their terminations, defendants Pitts, Davis and MOKI deployed ClinIQ, in the competing venture MOKI. Moreover, defendant M Charleigh Consulting, LLC ("M Charleigh"), an entity owned solely by Pitts, now appears to be using the Practices' "ReAlign Health" brand to market the Practices' ClinIQ platform to the public. Absent an order restoring the Practices' access to their patients' PHI and restraining further use and disclosure of the Practices' property and trade secrets, the Practices are suffering and will continue to suffer irreparable harm to their patients, their goodwill, and their competitive position — harm that no later award of money damages can undo.

The Practices satisfy each of the four prerequisites for a temporary restraining order and preliminary injunction and respectfully request that the Court enter the relief described below.

**Statement Of Facts**

The Practices are Mississippi medical practices founded and directed by Dr. Micah R. Walker ("Dr. Walker"). Defendant Morgan Pitts was a nurse-practitioner employee and an independent contractor of the Practices who also served chief marketing officer and the Clinic Manager for Women's Wellness of Mississippi ("Women's Wellness") until her termination on September 14, 2026. Defendant Davis was a nurse practitioner engaged by the Practices as an independent contractor who also served as their Clinical Coordinator and Compliance Officer until her termination on the same date. (Compl. ¶¶ 2, 11-14)

The Practices maintain confidential and proprietary information essential to their business, including patient lists and demographic data, clinical protocols and chart-review materials, vendor and pharmacy relationships, formulary and pricing information, and the ClinIQ clinical-software platform. It protects that information through secure, password-protected systems, restricted access, and written confidentiality and return-of-property policies. (Compl. ¶¶ 18-19)

While still affiliated with the Practices, Pitts and Davis formed, organized and prepared to launch a competing venture, Defendant MOKI. (Compl. ¶ 3) On June 8, 2026, while still affiliated with the Practice, Davis created and exported patient lists from the Practice's Elation electronic health record ("EHR") system. (Compl. ¶ 32 and Exh. 2) On September 1, 2026, Davis's Practice account trashed approximately twenty-six files from the Practices' computer system over approximately thirty minutes and then permanently deleted most of them, including a collaborative-practice agreement and compliance-related materials. (Compl. ¶ 33 and Exh. 3). On the same day and during the same approximately thirty minute window, Morgan Pitts's Practices account trashed approximately 17 unique files from the Practices' computer system, including what appears to be a collaborative practice agreement, login credentials, and various protocols and standing orders of the Practices. (Compl. ¶ 34 and Exh. 3)

On September 12, 2026, two days before her termination, Davis forwarded from her Practice email to the competing venture's account multiple categories of Practice information, including vendor, pharmacy, and formulary resources and provider login credentials, including credentials to a compounding-pharmacy account containing patient prescription information. (Compl. ¶ 35 and Exh. 4.) She also attempted to recredential several accounts that belonged to the Practices to the new venture, MOKI, and partially succeeded. (Compl. ¶ 36 and Exhs. 5 and 6)

ClinIQ is a software platform that was developed during Pitts's affiliation with the Practices, in response to Dr. Walker's request to address the Practices' clinical and operational needs and using the Practice's funding, systems, accounts, and resources. ClinIQ was incubated in Women's Wellness and populated with Women's Wellness patient information. Its dashboard reflected more than approximately 1,800 patient profiles. (Compl. ¶¶ 22-26.) After Pitts's termination, on or about September 21, 2026, Dr. Walker lost access to ClinIQ and was unable to reset credentials to login, and the platform displayed a lock condition. Another login on September 24, 2026, yielded the same results. As a result, the Practices have been unable to access their patient records and PHI maintained within ClinIQ — more than approximately 1,800 patient profiles — on infrastructure the Practice no longer controls. (Compl. ¶ 39 and Exh. 7)

Before filing this lawsuit and asking this Court for injunctive relief, counsel for the Practices made numerous attempts to confirm the location and security of the Practices' PHI and to secure the PHI's return, as required by HIPAA. (Compl. ¶ 40 and Exh. 8) Defendants admitted to having but declined to return the PHI which, upon information and belief they are using in the competing venture MOKI. (Compl. ¶ 42 and Exh. 9)

Instead, in mid-October, defendants, through counsel, asserted that after her termination Pitts "cancelled" the Women's Wellness ClinIQ "subscription" and removed the "account's" payment method. Because ClinIQ was a software platform developed within the Practices (and Women's Wellness was simply a d/b/a of the Practices), there should have been no "subscription," "account," or payment method, all of which Plaintiff believes were unilaterally set up, without authority, by Pitts while she was still affiliated with the Practices. (Compl. ¶ 41) Defendants' unsubstantiated claims, through counsel, that the Practices' PHI is preserved and that no unauthorized party is using it both rings hollow <u>and</u> constitutes an admission that Defendants are

indeed wrongfully withholding the Practices' PHI in violation of federal law. (Compl. ¶ 42 and Exh. 9). Before filing this lawsuit and asking this Court for injunctive relief, the Practices attempted, to no avail, to determine the identity of both Pitts's and Davis's new collaborating physician so that they could appeal to a ***physician(s)*** to try to secure the return of the Practices' PHI. The Practices have been unable to determine if either Pitts or Davis have new collaborating physician arrangements that comply with Mississippi law (or if they have them at all).[1] (Compl. ¶ 43).

Further, Pitts, without authority or the Practices' knowledge, registered the Practices' "ReAlign Health" brand to her entity defendant M Charleigh. M Charleigh now appears to be marketing ClinIQ to the public as "ClinIQ by ReAlign Health."[2] The Practices have not consented to M Charleigh's possession, commercialization, or use of ClinIQ. (Compl. ¶¶ 3, 31 and Exh. 1)

Within days of the separations, the competing venture, MOKI, deployed ClinIQ as part of its public-facing prospective-patient intake process, embedding a live ClinIQ-hosted intake form on its "Founder List" webpage. The Practice have not consented to MOKI's possession, commercialization, or use of ClinIQ. (Compl. ¶ 45) Following the separations, Women's Wellness experienced more than thirty patient cancellations, and Defendants publicly promoted MOKI and solicited prospective patients. (Compl. ¶ 46)

---

[1] Counsel for the Practices contacted the Mississippi State Board of Nursing ("MSBN") which declined to identify Pitts' new collaborating physician without authorization from Pitts. Disturbingly, the Board – which is tasked with regulatory compliance for nurses - took the position that collaborative agreements and the identity of the collaborating physician are exempt from public disclosure. Thus, the Practices cannot determine if Pitts is practicing under the supervision of a collaborating physician at all, much less in a manner that meets state law requirements. Further, through queries to the MSBN and Mississippi State Board of Medical Licensure ("MSBML"), Plaintiffs have discovered that Davis currently has no approved practice site on file with the MSBN and no collaborating physician registered with the MSBML. Yet MOKI social media posts demonstrate that Davis is actively treating patients and prescribing therapeutics at MOKI.

[2] Upon information and belief, some or all of the Defendants are marketing ClinIQ to the public without regard for whether it is a "device" under the Federal Food, Drug, and Cosmetic Act (FDCA) that requires FDA clearance or approval before marketing, or whether it qualifies for the 21st Century Cures Act clinical decision support (CDS) exclusion or another exemption.

## Argument

A party seeking a temporary restraining order or a preliminary injunction in this District must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm absent an injunction; (3) that the balance of equities favors an injunction; and (4) that an injunction serves the public interest. *JXN Undivided Coal. v. Tindell,* 771 F. Supp. 3d 872, 877 (S.D. Miss. 2025); *Miss. Ass'n. of Educators v. Bd. Of Trustees of State Inst. of Higher Learning*, NO. 3:25-cv-00417-HTW-LGI, 2025 WL 2142676, at *1 (S.D. Miss. July 20, 2025). The Practices recognize that they bear the burden of proof and readily meet that burden.

### I. The Practices are substantially likely to succeed on the merits of their trade-secret claims.

To show a likelihood of success, the Practices must present a prima facie case, but "need not prove that [it] is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The Practices readily do so on their claims under the federal Defend Trade Secrets Act ("DTSA") and the Mississippi Uniform Trade Secrets Act ("MUTSA").

The DTSA creates a private right of action for the owner of a trade secret related to a product or service used in, or intended for use in, interstate or foreign commerce. 18 U.S.C. § 1836(b). The MUTSA similarly creates a cause of action for misappropriation of another's trade secrets accessed through improper means. Miss. Code Ann. §75-26-1 et. seq.; *Seven Seas Tech., Inc. v. Infinite Computer Solutions, Inc.*, 353 F.Supp. 3d 545, 553 (S.D. Miss. 2018).

With the exception of an interstate commerce requirement for claims asserted under the DTSA, the state and federal claims are substantively nearly identical. The DTSA defines a trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering

information, including patterns, plans, ***compilations***, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing " if the owner has taken reasonable measures to keep the information secret and the information derives economic value from not being known. 18 U.S.C. § 1839 (3) (emphasis added). The MTSA defines a "trade secret" as information — including a ***compilation***, program, method, or technique — that derives independent economic value from not being generally known or readily ascertainable and that is the subject of reasonable efforts to maintain its secrecy. Miss. Code Ann. § 75-26-3 (emphasis added).

The elements of a misappropriation claim under Mississippi law are (1) the existence of a trade secret (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (3) the use of the trade secret was without the plaintiff's authorization. *Seven Seas*, 353 F.Supp.3d at 553. Under the DTSA, plaintiff must similarly prove that (1) it owns a valid trade secret; (2) the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the opposing party misappropriated the trade secret. *Computer Sciences Corp. v. Tata Consultancy Services, Ltd.*, 159 F.4th 429, 438 (5th Cir. 2025). The statutory definition of "misappropriation" encompasses the requirement that the secret be acquired by improper means. *Id.*; 18 U.S.C. § 1839 (5).

The Practices' patient lists and demographic compilations, their clinical protocols and chart-review materials, their vendor, pharmacy, and formulary compilations each qualify as compilations of information that constitute trade secrets. *Fred's Stores of Miss., Inc. v. M & H Drugs, Inc.*, 725 So.2d 902, 909-910 (pharmacy's customer list with pharmacy usage information found to be a trade secret); *Crawford Professional Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d

249, 262 (5th Cir. 2014) (patient and prescription information treated as proper subject of trade secret misappropriation claim); *Zoecon Indus. A Div. of Zoecon Corp., v. Am. Stockman Tag Co*., 713 F.2d 1174, 1179 (customer lists are trade secrets). Each was assembled through the Practices' effort and expense, derives independent economic value from not being known to competitors, and was protected through password-restricted systems and written confidentiality policies. (Compl. ¶¶ 18-19, 58). Both statutes include compilations of information in their text definitions of "trade secrets." 18 U.S.C. § 1839(3); Miss. Code Ann. § 75-26-3.

ClinIQ is also a trade secret. The Practices' ClinIQ platform (and its configured contents) is unique software developed inside the Practices for use by the Practices to address the Practices' clinical and operational needs. It was incubated using data from Women's Wellness with the expectation that it would eventually be utilized across the various clinics encompassed by the Practices. (Compl. ¶ 22). ClinIQ uses artificial intelligence technology to analyze PHI pulled from the Practices' Elation electronic health records ("EHR"). The software was designed to connect the dots across labs, helping clinicians at the Practices identify patterns, stratify risk, and make decisions with clarity and confidence; to provide the Practices' patients with clear, easy to understand and follow personalized insights with guidance on nutrition, supplements, and lifestyle; and to assist the Practices generally in tracking trends over time and capturing deeper clinical insight through more efficient documentation (including AI-supported SOAP notes). (Compl. ¶ 23). The Practices protected the platform through secure, password-protected systems, restricted access, and written policies. (Compl. ¶¶ 18-19). ClinIQ is plainly a trade secret. *Seven Seas*, 353 F. Supp. At 553 (software with unique and specific insurance claims processing capabilities sufficient to support trade secret misappropriation claim). Defendants cannot dispute the independent economic value of the software as MOKI is using the platform in the competing

venture and M Charleigh is attempting to market the platform to the public. (Complaint ¶¶ 31, 45). Before defendants commandeered it, the configured ClinIQ environment was an asset that contributed to the Practices' competitive position in delivering medical and aesthetic services. (Compl. ¶ 57).

Misappropriation is established by acquisition of a trade secret by improper means, or by disclosure or use of a trade secret, without consent, by a person under a duty to maintain its secrecy. 18 U.S.C. 1839 (5) and (6); Miss. Code Ann. § 75-26-3. Pitts, as a nurse practitioner, chief marketing officer and Clinic Manager, and Davis, as a nurse practitioner and the Clinical Coordinator and Compliance Officer occupied positions of trust and were bound by the Practices' confidentiality and return-of-property policies. (Compl. ¶¶ 18-21.) They nonetheless exported the Practices' patient lists (Compl. ¶ 32 and Exh. 2)); transferred vendor, pharmacy, formulary, and credential information to the competing venture MOKI (Compl. ¶ 35 and Exh. 4); recredentialled Practices' accounts to the competing venture (Compl. ¶ 36 and Exhs 5 and 6); and retained, deployed in MOKI, and attempted to publicly commercialize the ClinIQ platform (Compl. ¶¶ 31, 45 and Exh. 1). They were not authorized by the Practices to do so. (Compl. ¶¶ 28-29, 31-36, 45, 64, and 70-71).

The Practices' trade secrets relate to services provided in interstate commerce. . As part of offering medical and aesthetic services, the Practices have relationships with out of state laboratories, vendors, compounding pharmacies and treatment partners. (Complaint ¶ 59) Further, the Practices transmit patient specimens, proprietary protocols, and billing information to out-of-state laboratories, vendors, pharmacies and insurers as part of delivering medical services (*Id.*). The interstate-commerce element of the DTSA is satisfied. 18 U.S.C. § 1836.

The Practices are therefore likely to succeed on both their federal and state law trade-secret claims.

## II. The Practices face a substantial threat of (additional) irreparable harm absent an injunction.

Irreparable harm is harm that cannot be undone by money damages, ***or*** one for which money damages would be especially difficult to calculate. *Daniels,* 710 F.3d at 582–585. Here, the Practices face substantial risk of harm to their customer goodwill as evidenced already by the thirty patient cancellations for Women's Wellness that came almost immediately after the terminations and the opening of MOKI. (Compl. ¶ 46). "A loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable." *Union Nat. Life Ins. Co. v. Tillman*, 143 F. Supp. 638, 645 (N.D. Miss. 2000). *Allied Marketing Group, Inc. v. CDL Marketing, Inc*., 878 F.2d 806, 810, n. 1 (5th Cir. 1989) (damage to customer goodwill found to be difficult to calculate and thus irreparable harm).

The loss of the Practices' trade secrets compounds the risk of irreparable harm. A former employee with knowledge of even one trade secret working for direct competitor, without restriction, creates a real prospect of irreparable harm. *FMC Corp. v. Varco Int'l, Inc*., 677 F.2d 500, (5th Cir. 1982). Indeed, the Practices need not separately establish specific irreparable harm to obtain preliminary injunctive relief under the MUTSA because "a violation of the MUTSA itself constitutes irreparable injury." *Union Nat. Life Ins. Co. v. Tillman*, 143 F. Supp. 638, 641-642 (N.D. Miss. 2000). It is for this reason that the MUTSA allows injunctions to prevent even *threatened* misappropriation of trade secrets. Miss. Code Ann. § 75-26-5.

Those principles squarely fit this case. Defendants possess the Practices' patient, vendor, and formulary information and the ClinIQ platform, and are in a position to use — and at least as

to the platform are already using — them through MOKI, which has deployed ClinIQ in its public patient-intake process. (Compl. ¶ 45) M Charleigh claims through the Practices' "ReAlign" brand to possess the ClinIQ platform and is attempting to commercialize it with sales to the public. (Compl. ¶¶ 3, 31, 54).

Finally, the lockout also compounds the irreparable harm independently. The Practices cannot access the patient records and PHI maintained within ClinIQ — more than approximately 1,800 patient profiles — on infrastructure they no longer control. (Compl. ¶ 39 and Exh. 9) Where a party is denied access to business-critical records, there is no adequate remedy at law, because the access rights "will be rendered meaningless if they must await final judgment." *Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE, 2015 WL 1981563, at *7 (W.D. Tex. May 1, 2015). The inability to reach patient medical records threatens patient care and the Practices legal obligations to safeguard PHI (i.e., pursuant to HIPAA), an ongoing injury that intensifies each day and cannot be undone after the fact.

## III. The balance of equities favors an injunction.

The threatened injury to the Practices far outweighs any harm an injunction would cause defendants. The requested order would require only that defendants stop using and disclosing information that is not theirs and restore the Practices' access to their own PHI and records. Defendants have no legitimate interest in continuing to use the Practices' trade secrets, in deploying the Practices' platform in a competing venture, in marketing the Practices' software platform to the public, or in withholding the Practices patient PHI. An order protecting the Practices' property and restoring their access imposes no cognizable hardship on defendants, while its denial would leave the Practices without access to their patients' records and exposed to continuing competitive injury. The balance is decisively in the Practices' favor.

## IV. An injunction will not disserve — and will affirmatively serve — the public interest.

The public-interest factor applies even in a dispute between private parties. *Miss. Power & Light Co., v. United Gas Pipe Line Co*., 760 F. 2d 618, 625 (5th Cir. 1985). Both the DTSA and the MUTSA reflect a public policy of enjoining actual or threatened misappropriation. 18 U.S.C.A. § 1836 (3); Miss. Code Ann. § 75-26-5. Enforcing those protections serves the public interest.

The public interest is further served by restoring the Practices' access to patient medical records and PHI, which bears directly on patient care and continuity of treatment. An injunction that protects the Practices' trade secrets and restores access to patient records advances, rather than disserves, the public interest.

Lastly, if Pitts and Davis, as nurse practitioners, are operating MOKI and providing medical treatment without properly collaborating with a physician as required by state law, the public interest is further served in enjoining such behavior.

## V. The requested relief, including the restoration of access, is authorized and appropriately tailored.

The Court has ample authority to grant both the prohibitory and the affirmative relief the Practice seeks. The DTSA authorizes an injunction "to prevent any actual or threatened misappropriation" and, "if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret." 18 U.S.C.A. § 1836 (b)(3)(A). The MUTSA likewise provides that "[a]ctual or threatened misappropriation may be enjoined" and that "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order." Miss. Code Ann. § 75-26-5.

The affirmative component requested here — an order directing defendants to restore the Practices' access to the ClinIQ patient data — is proper even though it alters, rather than preserves,

the present state of affairs. The point of an injunction is to prevent injury so that a meaningful decision can be rendered at trial on the merits. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("focus always must be on prevention of injury by a proper order, not merely on preservation of status quo."). The currently existing situation itself is causing the Practice's irreparable injury. As such, the only way to prevent irreparable injury is to alter the situation by issuance of a mandatory injunction. Courts grant mandatory preliminary relief compelling access to records where, as here, the denial of access causes injury that cannot await final judgment. *Travelers*, 2015 WL 1981563, at *7. The requested relief is specific and appropriately tailored.

## VI. Procedural requirements are satisfied, and only a nominal bond, if any, is warranted.

Because defendants are represented by counsel[3] and can be heard promptly, the Practices do not seek ex parte relief under Rule 65(b) and will provide Defendants notice of their application for relief. However, the Practices request an expedited hearing as an urgent and necessitous matter under this District's local rules. L.U. Civ. R. 7(b)(8). A preliminary injunction may issue on notice to the adverse party. Fed. R. Civ. P. 65 (a).

Rule 65(c) permits the Court to require security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c) Because the requested relief principally protects the Practices' own property and their patients' records and imposes no legitimate cost on Defendants, the

[3] Pitts and Davis are represented by counsel who has been corresponding with Plaintiffs' counsel on their behalf. Plaintiffs believe, but have not confirmed, that same counsel will represent their entities, MOKI, LLC and M Charleigh Consulting, LLC.

Practices submits that no bond, or at most a nominal bond, is warranted, and they stands ready to post security in whatever amount the Court deems proper.

## Conclusion

For the foregoing reasons, the Practices respectfully request that the Court grant their Motion, enter a temporary restraining order and a preliminary injunction restraining defendants' use and disclosure of the Practices' trade secrets and confidential information and their further use of the ClinIQ platform, directing defendants to restore the Practices' access to their patient records and to preserve all relevant evidence, and granting such other and further relief as the Court deems just and proper.

Respectfully submitted this the 13th day of November 2026.

**MICAH R. WALKER M.D., LLC d/b/a WOMEN'S WELLNESS OF MISSISSIPPI and NEWCARE MD, LLC**

By: */s/ Stephanie M. Rippee*
Stephanie M. Rippee

OF COUNSEL:
Stephanie M. Rippee (MSB No. 8998)
WATKINS & EAGER PLLC
Post Office Box 650
Jackson, MS 39205-0650
(601) 965-1900 (p)
(601) 965-1901 (f)
*srippee@watkinseager.com*

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

This Complaint was generated with the assistance of Westlaw CoCounsel and Westlaw AI Deep Research. I hereby certify that, in compliance with Federal Rule of Civil Procedure 11, I have independently reviewed the source material and verified the accuracy of the artificial content. I understand that I am responsible for the contents of this Complaint and that failure to comply with Rule 11(b) may result in sanctions under Rule 11(c).

This the 13th day of November 2026.

*/s/ Stephanie M. Rippee*
Stephanie M. Rippee

**CERTIFICATE OF SERVICE**

I, Stephanie M. Rippee, hereby certify that I have this day caused Plaintiffs' Memorandum Brief in Support of Motion for a Temporary Restraining Order and Preliminary Injunction to be served via electronic mail to:

Mary R. Arthur
Heidelberg, Patterson, Welch, Wright
368 Highland Colony Parkway
Ridgeland, Mississippi 39157

This the 13th day of November 2026.

*/s/ Stephanie M. Rippee*
Stephanie M. Rippee